# HURD *v.* CRAMER.*

EQUITY; ADEQUATE REMEDY AT LAW; GIFTS; FRAUD; MENTAL INCAPACITY; UNDUE INFLUENCE; PROCESS.

1. Equity has no jurisdiction where the plaintiff has a plain, adequate, and complete remedy at law; but to be such, the remedy at law must be as practical and efficient to the ends of justice and its prompt administration as the remedy in equity.

2. There is no such plain, adequate, and complete remedy at law as to exclude equitable jurisdiction of a suit to set aside, upon the ground of fraud and undue influence, gifts of money and property by one who has been adjudged incompetent, where the incompetent's memory as to the transactions is defective, and the books which came into the hands of his conservator contain no evidence of the transfers, which extended over a period of several years, and which were concealed by the defendant, and the funds received by the defendant have been converted into notes whose makers are unknown to the plaintiff, and where the suit in equity involves account, fraud, misrepresentation, concealment, discovery, declaration of trust, the following of trust funds, and injunction. (Citing *George* v. *Ford*, 36 App. D. C. 315.)

3. An aged man's manifestation of some of the weaknesses of old age and

---

* *Mental incapacity—Undue influence.*—For cases upon the question of effect of belief in spiritualism upon testamentary capacity, see notes to *Lewis* v. *Arbuckle*, 16 L.R.A. 677, and *Steinkuchler* v. *Wempner*, 15 L.R.A. (N.S.) 673; as to what is testamentary capacity, see note to *Slaughter* v. *Heath*, 27 L.R.A.(N.S.) 1.

his belief in spiritualism do not alone constitute such mental incapacity as will warrant the setting aside of gifts by him of money and property.

4. Such influence over a man eighty-nine years of age as is a natural concomitant of his gratitude to a woman who attended and cared for him in his infirmity would be insufficient to warrant the setting aside of gifts of money and property to her, although they were large and frequent. (Citing *Madre* v. *Gaskins*, 39 App. D. C. 19.)

5. Large gifts of money and property by a man eighty-nine years of age, and a believer in spiritualism, to a woman with whom he made his home, will be set aside at the suit of his executor on the ground of fraud and undue influence, where they were induced by what the defendant represented as spiritual communications from the donor's deceased wife, to whose memory he was deeply devoted, and where the defendant concealed the gifts from the donor's children, and, while representing to them her desire to overcome his unkindness and lack of generosity to them, was really engaged in exciting his prejudices against them by suggesting that they cared only for his money.

6. Where gifts of money which were procured from a decedent by fraud and undue influence have been converted by the donee into securities, and in a suit by the executor the donee has failed to discover their whereabouts, the plaintiff is entitled to have such incidental auxiliary process as may be necessary to procure the possession of all such securities and the proceeds thereof.

No. 2483.    Submitted March 6, 1913.    Decided May 5, 1913.

HEARING on an appeal by the plaintiff from a decree of the Supreme Court of the District of Columbia, dismissing a bill in equity to cancel certain gifts and transfers of money and to declare a trust.                                          *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree dismissing a bill filed on behalf of Fenton J. Hurd by Lee M. Hurd, conservator of his person and estate, and his next friend, against Laura R. Cramer and the Washington Loan & Trust Company, to cancel certain gifts and transfers of money and to declare a trust.

The original bill, filed June 27th, 1910, alleged that on the

21st day of April, 1910, Fenton J. Hurd had been adjudged incapable of transacting business by the probate court in the district of Greenwich, State of Connecticut, and the plaintiff, Lee M. Hurd, was duly appointed by said court as conservator of the person and estate of Fenton J. Hurd.

That the said Fenton J. Hurd was, from about the year 1891 to the early part of 1910, a resident of the city of Washington, and during a considerable part of that time made his home with the defendant Laura R. Cramer, in said city. That the said Fenton J. Hurd is a man advanced in years, being now in the eighty-ninth year of his age, and for ten years past has been mentally incapable of managing his own business affairs; that during all of period of ten years the said defendant Laura R. Cramer has exercised a dominating influence over him, the said Hurd reposing in her the utmost confidence.

That Mary S. Lee Hurd, wife of the said Fenton J. Hurd, and to whom he was greatly devoted, and who had been of the most helpful assistance in the accumulation of his property, died on September 11th, 1891, and the said Fenton J. Hurd was greatly affected by her death, and thereafter entertained the belief that it was possible for departed spirits, through certain persons denominated "mediums," to hold communications with their loved ones so living, and was greatly influenced in respect to all business matters by any communication received by him purporting to come from his deceased wife, especially when such communications came to him through the medium of defendant Laura R. Cramer.

That this belief was well known to the defendant Laura R. Cramer, who encouraged him in such belief and herself acted the part of the "medium," and frequently presented him with such communications purporting to have been received by her for him from his deceased wife, and signed "Mary," the name of his said wife; and the said Fenton J. Hurd, by reason of his sincere devotion to his said wife, and the said Laura R. Cramer being a person in whom he entertained the greatest confidence, having acquired and exercised a controlling influence over him, readily accepted these communications as in fact having been

made to him by his deceased wife, and acted in accordance with the suggestions and request contained in said letters.

That the said defendant Laura R. Cramer, well knowing the implicit confidence imposed in her by said Fenton J. Hurd, and that he was incapable of attending to his business affairs and safeguarding his interests, and also well knowing his devotion to the memory of his deceased wife, and the readiness with which he accepted any suggestion or request which he believed came to him from his said wife, on frequent occasions presented to him communications, which she had fraudulently represented and pretended came from his deceased wife, which communications contained suggestions and requests that he should place large sums of money in the hands of said Laura R. Cramer. The said Fenton J. Hurd, believing that he was carrying out the will of his said wife, did from time to time, during nine years, give to defendant sums aggregating more than $40,000. The drafts representing various large amounts were cashed by the said defendant Laura R. Cramer, through the Washington Loan & Trust Company, among them being the following, to wit: May, 1904, $6,000; April, 1905, $5,000; April 16, 1906, $6,000; December 19, 1906, $4,000; May 5th, 1909, $10,000; besides drafts for other large amounts at divers times. Plaintiff alleges that the said amounts went into the account of the defendant Laura R. Cramer, with the defendants the Washington Loan & Trust Company, and that any money in possession of the said trust company to the credit of defendant are moneys to which the said Fenton J. Hurd, or the plaintiff, as conservator of his estate, is justly entitled.

That in furtherance of the fraudulent purpose of said defendant, and in order to prevent an inquiry on the part of the son and grandson of said Hurd into his affairs, said Laura R. Cramer falsely and fraudulently represented to the said Hurd that the said son and grandson were indifferent to his welfare, and anxious only that his death might come as speedily as possible in order that they might come into possession of his money; and induced said Hurd to believe that such was the case; and that at the same time, and with a like purpose, the

said Laura R. Cramer represented to the said son and grandson that the said Hurd was very bitter against and antagonistic to them, and was very close in money matters, and would spend money for no purpose, not even for clothes. Plaintiff alleges that the representations that the son and grandson of said Hurd were indifferent to his welfare and cared only that they might come into possession of his estate were, as was well known to Laura R. Cramer to be, wholly false and fraudulent; and further, that, at the time when the said Laura R. Cramer represented to the said son and grandson that said Hurd was penurious and close, she was receiving from him, as above alleged, moneys and property aggregating in value more than $40,000.

Plaintiff is advised that, as conservator of the estate of said Fenton J. Hurd, he is entitled to have said transfers of money and property from the said Fenton J. Hurd to the said Laura R. Cramer set aside, as having been obtained by fraud and undue influence practised at a time when said Fenton J. Hurd was mentally incapable of attending to his own affairs and safeguarding his own interests, and to a decree requiring the said defendant Laura R. Cramer to account for the moneys and property received by her, and to pay over and deliver the same to plaintiff; and further, to a decree declaring the moneys in the hands of the defendant the Washington Loan & Trust Company, to the credit of defendant, to be the property of the said Fenton J. Hurd, and enjoining the defendant trust company pending this suit, and perpetually, paying out said moneys to any person except plaintiff.

Upon information and belief plaintiff alleges that, in addition to the account kept in the Washington Loan & Trust Company, the said defendant Cramer also rents from said defendant trust company, a safe-deposit box, the contents of which box are to the plaintiff unknown, but the plaintiff believes that any securities or property therein were purchased with the proceeds of the fraud practised by her upon Fenton J. Hurd, and plaintiff believes that he is entitled to a decree enjoining the defendants Laura R. Cramer, the Washington Loan & Trust Company, pending this suit, and perpetually, from having access to or with-

drawing from said box any of the contents thereof, except upon the order of this court.

The prayers of the bill are:

First. That the various transfers of property and money made by the said Fenton J. Hurd may be decreed to be vacated and set aside, on the ground that they were procured by fraud and undue influence practised by her upon the said Fenton J. Hurd.

Second. That the defendant Laura R. Cramer may be decreed to hold all such money and property in trust for the said Fenton J. Hurd, and that she may be required to account therefor.

Third. That any moneys on deposit in the Washington Loan & Trust Company to the credit of the said Laura R. Cramer may be decreed to belong to the said Fenton J. Hurd, and that the said trust company may be enjoined pending this suit and perpetually from paying any of said money to said Laura R. Cramer, or order, and may be required to pay the same to the plaintiff.

Fourth. That the said defendant and the Washington Loan & Trust Company may be enjoined from having access to or withdrawing from any safe-deposit box rented from said company by said Laura R. Cramer, any of the contents of said box, and that any securities in said box may be decreed to belong to said Fenton J. Hurd.

Fifth. That the Washington Loan & Trust Company may be required in its answer to set forth a true and correct statement of the account of said Laura R. Cramer, showing the dates and amount of deposit, the bank upon which checks and drafts were drawn, by whom, etc.

Sixth. That the defendant Laura R. Cramer may be enjoined, pending this suit, and perpetually, from conveying, transferring, incumbering, or otherwise disposing of any property acquired by her with the proceeds of money or other property acquired by her from the said Fenton J. Hurd.

Seventh. For general relief.

The answer of Laura R. Cramer denies the allegations of fraud and undue influence, and that Fenton J. Hurd was of weak mind. She admits that she had influence over Hurd, but denies that it was dominating influence, and avers that such influence as she had with him arose from the strong affection which the said Fenton J. Hurd felt for her, and which she had earned by giving him the care of a daughter during the many years of their close association.

She also admits that said Hurd entertained the belief that it was possible for the spirits of the dead to communicate with the living, and she has knowledge that said Fenton J. Hurd believed from time to time, that through the medium of certain persons he received communications from his deceased wife, but she has no knowledge that he was ever influenced in his business affairs by such conditions. She denies that she is a spiritualist by profession, or ever acted the part of a medium; and avers that she frequently discussed with said Hurd his belief in spiritualism, and tried to dissuade him therefrom, but without success,—he having been a believer in the doctrines of that cult since his early manhood. Said Hurd on several occasions suggested that this defendant might have power as a "medium," but she always negatived such suggestions and at no time pretended or asserted such powers. The statement that this defendant gave him supposed communications from his deceased wife to procure from him money is untrue.

She says that it is true that Fenton J. Hurd did from time to time make her gifts of considerable sums of money for which she gave him no pecuniary consideration, but only the affectionate care which she for many years showed him, and for which he was intensely grateful; and she further says that such gifts were wholly voluntary from the said Fenton J. Hurd, and were, as she verily believes, in pursuance of a settled purpose on his part to so provide for this defendant that she should not be in danger of suffering from want or be deprived of the comforts of life, should she, through any misfortune, become incapacitated for work or lose her position in the government employ. The defendant is in middle life and is now, and for

more than twenty-two years has been, a clerk employed in the government service in the Department of State. Her duties in such service are engrossing and at times arduous, all of which was well known to Fenton J. Hurd, who frequently expressed the intention of so providing for her that she need not work so hard; and upon more than one occasion suggested to her that she resign her position. From the time of the death of his wife in 1891, said Fenton J. Hurd had preferred to live anywhere else than with his son or grandson, and until at his request this defendant received him into her household, he had only the casual and indifferent care which is usually found in boarding houses. Having retired from the active business life in which he had acquired a competence, Mr. Hurd spent much of his time at his room, and this defendant saw much of him, and a sincere friendship sprang up between them; this defendant giving him all the care and attention which she could have given him had he been her father, and he, upon the other hand, willingly making himself useful by doing the marketing and otherwise relieving this defendant of domestic duties.

That the relation between this defendant and Fenton J. Hurd grew into a sincere regard for him, upon her side, and upon his to a grateful affection which has many times expressed and was at no time abated or·interrupted. And defendant further says that said Fenton J. Hurd frequently informed her that she was the best friend he had upon earth and the only person who had any care or affection for him. Said Fenton J. Hurd further informed this defendant that he had no regard or care for his son, Byron Hurd, father of the plaintiff, and said Fenton's only prospective heir and next of kin, and that said Byron had no right to expect anything from him, he having already given him a farm of 500 acres near Whallenburg, New York, and having also bought for and given him a drug store, with its equipment. Said Fenton J. Hurd looked upon his son as a spendthrift and regarded him with fear.

Defendant says that she has no memorandum which shows the dates and amounts of said gifts of money to her by the said Fenton J. Hurd, but believes them to be as follows: May, 1904,

$6,000; April, 1906, $6,000; September, 1908, $5,000; May, 1909, $10,000. Says that it is untrue that the said gifts reached the sum of $40,000, and that it is also untrue that said gifts were induced by fraudulent representations. She further says that under the conditions it was not only not extraordinary that he should have selected this defendant as the object of his solicitude and care, but it would have been extraordinary if he had not done so, or if he had not felt an ardent desire to provide for her needs and guard her future against adversity.

She further avers that the claim to any money received by her prior to the 27th day of June, 1907, is barred by the statute of limitations, and she prays the benefit of the same. She denies the allegations that she sought to estrange the said Fenton J. Hurd from his son and grandson, and to cause ill feeling through false representations. She denies having a safe-deposit box in the Washington Loan & Trust Company. To this answer are attached a number of letters signed by Lee M. Hurd.

The Washington Loan & Trust Company filed an answer and attached thereto an itemized statement of the account from the date the same was opened on the 12th of June, 1901, to and including the month of March, 1910. Avers also that defendant Laura Cramer did not have a safe-deposit box rented from said trust company.

An amended bill was filed August 24, 1910, elaborating the allegations of the original bill, and stating the sum of additional amounts, with the dates thereof, received by defendant. Also alleges that the money so obtained by the defendant Cramer was invested by her or her agent, the Washington Loan & Trust Company, in notes of divers persons secured by deeds of trust of real estate, and particularly in the notes of Watson, Cockrell Miller, Bliss, Goldenburg, Norman, Hopkins & Miller, and Pettitt. And the plaintiff alleges that all of them, or such as have not been paid, are now in the possession of said defendant, the Washington Loan & Trust Company, as agent or trustee of defendant. Plaintiff is advised that by reason of the fact that the moneys and securities were procured by defendant through fraud, that he is entitled in equity to have the said notes

or other securities decreed to be held by said defendant or her agent, the Washington Loan & Trust Company, in trust for said Fenton J. Hurd, and to have an accounting from defendants, and to a decree enjoining each of them pending this suit, and perpetually, from transferring or otherwise disposing of said notes or any of them, and requiring them to deliver up the said notes or the proceeds thereof, if the same had to be paid, to the plaintiff.

The prayers of the bill follow those of the original bill, but, in addition, that the defendant Cramer be required to deliver to plaintiff all such money and property, with interest on all moneys from the date same were received; and further, that the said defendant may be required in her answer to this amended bill to disclose fully what notes or other securities or property she had in her possession or under her control, or has had in her possession, purchased or procured with moneys received directly or indirectly from said Fenton J. Hurd, or with moneys drawn from the account of said defendant, the Washington Loan & Trust Company, and if any of said notes or other security have been disposed of by her, and the consideration received therefor.

That a receiver be appointed by this court to take charge of the money in the hands of said defendants the Washington Loan & Trust Company to the credit of said defendant Laura R. Cramer, and all notes or other securities in the hands of said defendant trust company as agent or trustee for the said defendant Laura R. Cramer, and also of any notes in the possession or under the control of said defendant Laura R. Cramer, procured by her with moneys obtained from said Fenton J. Hurd.

That the Washington Loan & Trust Company may be required to set forth a true and correct statement of all transactions had by said company with the said defendant Laura R. Cramer, showing the dates and amounts of deposits, whether in cash, checks, or drafts, and particularly whether it now holds, as agent for defendant, the notes mentioned and referred to in its answer as Watson, Cockrell, Miller, Bliss, Goldenburg, Norman, Hopkins & Miller, and Pettitt.

The answer of the Washington Loan & Trust Company to the

amended bill sets out a statement showing the notes and securities acquired by said Cramer through it. The names of the makers of said notes and the dates thereof are given in detail.

That the said notes were delivered to defendant Cramer, and have not been seen by this defendant except in April, 1910, when presented by said Cramer for indorsement of interest paid. Immediately thereafter they were returned to defendant.

The one note in the possession of the defendant belonging to said Cramer is the one of F. M. Cockrell for $4,000, secured by a deed of trust. That said note is now in the possession of defendant as security for the sum of $1,500, with interest, being the amount of her indebtedness to said defendant.

Answering the amended bill of complaint, defendant Cramer refers to her answer of the original bill. She says that it is not true that the Washington Loan & Trust Company ever acted as her agent in the investments made by her. The defendants did from time to time purchase from the said trust company promissory notes secured upon real estate. Said trust company has not the possession or control of any of the promisory notes except the Cockrell note.

Defendant further says that no separate bank account was kept of the moneys given her by the said Fenton J. Hurd, but the same pass into the general account of this defendant, and were commingled with other funds belonging to her, and notes purchased by her from said company were paid for by means of checks upon said general account.

The second amended bill of complaint was filed April, 1911, in which the allegations of former bills are repeated. It repeats the allegations that, as to the several notes obtained by the said Cramer through the investments of money obtained from said Hurd, and such as are in the possession of said trust company, said trust company is receiving as agent for defendants payments on account and crediting same to the account of said Cramer. Repeats the allegation that plaintiff is entitled to have all of said notes decreed to be held in trust for said Hurd.

Upon joinder of issue testimony was taken at great length. The case came on for hearing and a decree was entered dis-

missing the bill October 1, 1912, in accordance with an opinion delivered September 26th.

The learned justice presiding in the equity court was of the opinion that there was no jurisdiction in equity to grant the relief sought by complainant. Thereafter, passing upon the facts, he expressed the opinion that said Fenton J. Hurd was of sound mind and capable of transacting business, and further, that the evidence was not sufficient to show that undue influence had been practised upon him through his peculiar beliefs.

After filing the record in this court, Fenton J. Hurd died. His death was suggested February 25, 1913, and on motion, Lee M. Hurd, executor of decedent's estate, was made a party appellant, and the cause revived in his name.

*Mr. Richard A. Ford, Mr. Wallace Donald McLean,* and *Mr. H. Gordon Pierce* for the appellant.

*Mr. Arthur A. Birney* and *Mr. Wharton E. Lester* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The first question for consideration is whether there is jurisdiction in equity to entertain the cause of action set out in the bill. If not, there will be no ground for passing upon the evidence. It is well settled that equity has no jurisdiction where the plaintiff has a plain, adequate, and complete remedy at law. *Hipp* v. *Babin,* 19 How. 271–278, 15 L. ed. 633–635; *Buzard* v. *Houston,* 119 U. S. 347–352, 30 L. ed. 451–453, 7 Sup. Ct. Rep. 249; *United States* v. *Bitter Root Development Co.* 200 U. S. 451–472, 50 L. ed. 550–560, 26 Sup. Ct. Rep. 318. But to be plain, adequate, and complete, the remedy at law must be as practical and efficient to the ends of justice, and its prompt administration, as the remedy in equity. *Boyce* v. *Grundy,* 3 Pet. 210–215, 7 L. ed. 655–657; *Tyler* v. *Savage,* 143 U. S. 79–95, 36 L. ed. 82–88, 12 Sup. Ct. Rep. 340.

We are of the opinion that such remedy as a court of law would give for the conditions alleged in the bill would not be of that plain, adequate, and complete nature requisite to exclude the jurisdiction of equity; clearly, it would not be as practical and as efficient to the ends of justice and its prompt administration. The case made out in the bill is more than a suit to recover by way of damages money obtained through a fraudulent contract, as in *Buzard* v. *Houston,* 119 U. S. 347, 30 L. ed. 451, 7 Sup. Ct. Rep. 249; or than a mere case of trover or trespass, as in *United States* v. *Bitter Root Development Co.* 200 U. S. 451, 472, 50 L. ed. 550, 560, 26 Sup. Ct. Rep. 318.

The suit was brought on behalf of a man then eighty-nine years of age, who had been adjudged incapable of managing his affairs, and in respect of person and estate committed to a conservator. His memory of transactions was defective, and the books and papers which came into the hands of the conservator furnished no evidence of payments, which, moreover, extended through a period of several years. The defendant had concealed the fact that she had received money from the plaintiff. The funds so received had been converted by defendant into secured notes, the makers of which were unknown to the plaintiff. Discovery, therefore, from the defendant and from the trust company, became necessary. If plaintiff had sued at law and recovered judgment against the defendant for any amount, it could not have been collected by execution. The bill, therefore, sought to have a trust declared in such of the money as could be found, and in such securities into which it could be followed; and sought to have their disposition enjoined, and an order for their delivery to a receiver. An accounting was also prayed as a necessary part of the relief sought. "Thus there were in the case as ingredients to support the jurisdiction of equity, discovery, account, fraud, misrepresentation, and concealment." *Tyler* v. *Savage,* 143 U. S. 79–95, 36 L. ed. 82–88, 12 Sup. Ct. Rep. 340. See *George* v. *Ford,* 36 App. D. C. 315–332. In addition to the ingredients above recited, the jurisdiction was invoked to declare a trust, to follow it into other property into which the trust

fund had been converted, and for an injunction to render this remedy effectual. Thus very different conditions were shown from those presented in *Buzard* v. *Houston,* and *United States* v. *Bitter Root Development Co. supra.*

2. The learned justice who presided in the equity court was right in his conclusion that the gifts of money made to the defendant could not be set aside and the same recovered on the mere ground of mental incapacity of the plaintiff at the time they were made. He was an extremely old man, it is true, with some of the weaknesses of old age, and was a firm believer in spiritualism, and that communications could be had with the spirits of the departed through "mediums." Such obsessions, however, do not of themselves constitute insanity or mental incapacity in the legal sense. If unpractised upon by fraud or undue influence through those obsessions, he had sufficient mental power to execute a valid contract, deed, or will.

3. The gist of the case is contained in the charge of fraud and undue influence upon the aged plaintiff, and the evidence relating thereto. This evidence is unnecessarily voluminous, and much of it is irrelevant. To recite it in substance and review it in detail would cause an unnecessary and unimportant consumption of space.

We find from the evidence that the plaintiff was eighty-nine years old at the time this suit was begun. He had many years before retired from business, invested his money in Western land mortgages, and lived upon his income. He and his wife had lived in Saratoga, New York, but finally spent most of the year in the city of Washington. His wife was a woman of intelligence and education; superior to him in the latter respect. Both were believers in "spiritualism," and the possibility of communication with departed spirits. Plaintiff loved and respected her in life and was devoted to her memory. She died in 1891. After her death he resided chiefly in the city of Washington, making yearly visits to Minnesota to look after his investments. He was close with his money, in other words, stingy, particularly with himself. He wore seedy old clothes

and hats, and could with difficulty be induced to replace them. He rarely, if ever, had more than one suit at a time. He had, apparently, saved a great deal of his income and added it to his principal. When he began to lodge with the defendant, his invested personal estate amounted to something over $90,000. He had a son who lived with his wife on a farm in New York State. This was the property of Mrs. Hurd, in which plaintiff had a life estate. This life estate he had relinquished to his son, who was his mother's heir at law. Plaintiff had a grandson also, Dr. Lee Hurd, who lived in Greenwich, Connecticut, and practised medicine in New York. This grandson had married and had three children. Plaintiff had educated him, and had given him $1,000 per year after his graduation. Plaintiff had expressed his pride in the grandson, and appeared to have had affection for him. Plaintiff boarded for a while in Washington with a Mrs. Schafer. Mrs. Schafer used to write letters to him, signed "Mary," which was the name of his deceased wife. He saw her write them and firmly believed that they were actual communications from his deceased wife. It does not appear that Mrs. Schafer used these letters to extract money from him. However, her husband obtained a loan of $1,000 from him. This was secured by a mortgage on a farm in Nebraska, which mortgage he subsequently foreclosed. He made some presents to her daughter, who also wrote occasional "spirit letters." Plaintiff was paying attention to a woman in Washington, and apparently contemplating marriage with her. This was broken off by Mrs. Schafer's daughter by agreement with plaintiff's son. This was accomplished through letters to him, purporting to come from the deceased wife, "Mary," which gave him information and suggestions (which he acted upon) how to discover that the woman entertained another suitor. Defendant, as well as others familiar with plaintiff, knew of the receipt of these "spirit letters" by plaintiff; that he believed in their genuineness, and was undoubtedly influenced by them. Plaintiff's son had by intimidation broken off an engagement of the plaintiff with a girl in Minnesota some time after the occurrence before related. The son, by his own admission,

broke off this engagement by threats of violence. There was, however, no open breach between them. The son visited him in Washington, and the father sent him $2,500 when the son's house was burned. He also made him annual presents. In company with defendant he paid a visit to his son, staying about two weeks. Plaintiff occasionally visited his grandson in New York and at Greenwich. Defendant accompanied him to New York on these visits, spending her time with a married daughter there. Friendly relations were maintained between defendant and Dr. Hurd and his wife, and there was friendly correspondence between them, as shown by their letters to her, some of which she attached to her answer. Plaintiff for six or seven years boarded with defendant, removing with her in her several changes of apartments. He paid his board regularly, and by defendant's admission, frequently made her presents of small sums of money. He had the freedom of the house like any member of the family, and sometimes attended to the marketing and otherwise relieved defendant of some of her cares. Defendant was a widow, near forty years of age when plaintiff commenced boarding with her; she had two children, both of whom married during the period. The married daughter went to live in New York and Brooklyn. The son, after working a while in New York, a position which Dr. Hurd helped him to secure, returned to Washington and obtained a government clerkship. Defendant was a clerk in the State Department, spending the bulk of each day, but Sunday, in her office. She was very kind to the plaintiff and made a comfortable home for him. He showed and expressed affection and solicitude for her.

Defendant says in her answer: "The relations between said Fenton J. Hurd and this defendant grew into a sincere regard for him upon her side, and upon his into a grateful affection which has been many times expressed, and was at no time abated or interrupted. And this defendant further says that said Fenton J. Hurd frequently informed her that she was the best friend he had upon earth and the only person who had any care or affection for him." Defendant, undoubtedly, had great influence over him. Had this care and attention by her, and his

grateful appreciation thereof, been the sole ground of his gifts of money to her, large and frequent as they were, we could not be justified in declaring them the product of undue influence. *Madre* v. *Gaskins*, 39 App. D. C. 19–28. But there is something more than this. Plaintiff was very fond of the memory of his wife, firmly believed that she could communicate with him through mediums who wrote letters to him in his presence, signed "Mary," and was constantly and greatly influenced by the purported wishes of "Mary." Defendant undoubtedly knew this. Plaintiff testified that defendant claimed to have the powers of a medium, and during his residence with her wrote as many as a hundred letters signed "Mary." None of these letters, and none of those received through the medium of Mrs. Schafer and her daughter, were found among plaintiff's papers which came into possession of his conservator. In her answer, defendant disclaimed any belief in spiritualism, and declared that she was a member of the Roman Catholic Church. She further says that "she frequently discussed with said Fenton J. Hurd his belief in spiritualism, and endeavored to dissuade him therefrom, but without success, he having been a believer in the doctrines of that cult since his early manhood. Said Hurd upon several occasions suggested that this defendant might have power as a medium, but she always negatived such suggestions, and at no time pretended or asserted such powers. The statement that this defendant gave him supposed communications from his deceased wife to procure from him money is untrue." In a letter written to Dr. Hurd, November 2d, 1907, by defendant, relating her efforts to induce his father to send him his allowance of $1,000 that had been withheld, she says: "I told him that I had often heard him say that it was Mary's wishes for him to give it to you as long as he lived, and if he had to obey her wishes in other things that he surely ought to where his own grandson was concerned, and this she had asked him from her own lips, and not through any old fraud spiritualist, and when I got through he didn't have a word to say, only, 'I guess you are right.' And I also told him if he couldn't write pleasant letters that he had better not write any at all."

In her testimony she admitted that she had, at Mr. Hurd's request, written him two letters signed "Mary." She said he had often asked her if she could not write medium letters, and couldn't she try, and so forth. One evening he said "Laura, can't you write a letter like Mrs. Schafer writes from Mary?" she replied: "Most anyone could write a letter like Mrs. Schafer writes." "I sat down and wrote him one or two, I do not remember just which, in a spirit of fun, to please him." These letters, she said, were written by her and received by him in a spirit of fun. He laughed and said they looked like Mrs. Schafer's. She could not recall the contents of the letters, but said that in one she may have said something about the $10,000 "which he had already given me or was about to give me for a birthday present." She admitted that the letter may have contained "be good to Laury," as plaintiff had testified, but she did not recall it. Considering Mr. Hurd's firm belief in the genuineness of the letters received through Mrs. Schafer, and defendant's knowledge of this, it is incredible that he regarded "spirit letters" written by her as mere matters of fun.

Her conduct and evidence in other respects do not impress us as ingenuous. Notwithstanding her answer bases the gifts made to her by Mr. Hurd upon his grateful appreciation of her daughterly affection and care, in her evidence she undertakes to found it upon an engagement of marriage between them, and claims that his first considerable gift was made of a sum that he had intended to invest in a house for her. According to her they became engaged in 1902 or 1903, and broke it off in 1905, because they were both in fear of violence by Byron Hurd, because of his character and his former threats that have been mentioned. That the old man would have undertaken to marry her is doubtless true; but that she seriously contemplated marrying him is quite doubtful. Nor can we believe that she would have been deterred from marrying him by the fear of violence by his son. She produced no letter from Mr. Hurd in evidence of an engagement; but only one brief note, in which he expressed his fondness, and it may be inferred therefrom that he looked forward to marriage with her. She

produced and attached to her answer as an exhibit, a letter dated April 26, 1906, from which it may be inferred that there had been no engagement between them.

He addressed her as "My dear friend, Mrs. Cramer," and begins by saying: "You may think it strange that with my good health and vigorous constitution I have never married again, and no doubt you have heard me say that there is no real happy life only in a married life; now I will tell you why I have not nor never will marry." He proceeds to say that his son's wife had told him that Byron said no woman should ever take his mother's place, and that if I got married he would shoot both of us. That he would be unhappy and in fear that he might appear and execute his threat, which his wife had said that, with his malicious disposition, she had no doubt of his doing. The important part of the letter follows. He then proceeds to say that he had drawn up a note for $10,000 as a small compensation for the happiness she had given and was giving him. He then said that she would have no difficulty in collecting it. She testified that a week later he paid her $6,000. She produced a brief letter addressed by her to him April 2d, 1906. This recited that the note she held for $10,000, dated April 2, 1906, she agreed to extend if he lived, yearly, until he was in a position to pay it. In this, ten thousand was erased and four thousand interlined; the figure four was also substituted for ten. She produced also a letter of the same date, directed by Mr. Hurd to his agent Ross, who lived in Minnesota, reciting the note for $4,000 held by Mrs. Cramer, and requesting payment, in case of his death before it matured, out of the first money collected of his estate. A similar letter was also addressed to Dr. Hurd. She admitted that this $4,000 was paid by Mr. Hurd; yet she retained the papers and did not turn them over to Dr. Hurd when he came down in March, 1910, at the time his father was dangerously ill. When he became able to travel, Dr. Hurd removed him to Greenwich, Connecticut. They were not among the papers found in Mr. Hurd's desk and tin box at that time. None of the books and papers obtained by him contained any memoranda relating to trans-

actions with defendant. She had made no loan to Mr. Hurd, but evidently had not so informed her counsel; and was present when he cross-examined Mr. Hurd upon the assumption that this transaction represented a loan. When interviewed by one of Dr. Hurd's counsel shortly before the institution of this suit, she denied having received money from Mr. Hurd. She not only suppressed the fact of this alleged engagement to Mr. Hurd from his son and grandson, but prevented their suspicions being aroused, by leading them to believe that she was engaged to marry another person, who had died not long before this litigation arose. While defendant was able to testify to the contents of letters and to conversations going back some years, she showed a serious lack of memory in regard to the dates and amounts of money received by her from Mr. Hurd. Though called upon in the bill to give a statement of the same, she said she had no memorandum to show the same, and stated that she believed she had received in all $27,000, as follows: May, 1904, $6,000; April, 1906, $6,000; September, 1908, $5,000; May, 1909, $10,000. The books of the Washington Loan & Trust Company, through which drafts were collected, and deposits made in the name of defendants, show that she received from Mr. Hurd from May, 1904, to May, 1909, $36,350. On her examination she could not produce the pass book issued by the trust company; said she was unable to find it.

During this time she was concealing from the grandson the fact that she was receiving money from Mr. Hurd, and was writing him of Mr. Hurd's stinginess. In a letter of November 14, 1908, to Dr. Hurd's wife, she said that she had given Mr. Hurd an "awful lecturing" for writing his "stingy, hard-up letters." "I told him I would not keep him in my house or turn my hand to wait on him unless he did the right thing by Mr. Byron and Lee as I say when I am talking to him. He was acting mean and ugly around the house for a week or so before I heard from the doctor, and on the first kept out $5 on his board, so I waited for two or three days, and told him I wanted it. He said 'I haven't got it' and when he did give it to me he turned his back and took it from a big roll, so you

need not think he is hard up, he has only one of his devilish spells on him." "Honestly Mrs. Hurd he is the most aggravating man that I ever knew, he.is the limit. Doctor was so kind in aiding Ford to get something to do that I shall always feel indebted to him and anything that I can do or say to his grandfather in his favor will only be a great pleasure to me. He goes around looking terrible, too darn stingy to buy a suit—Well there is one consolation, you will have that much more, won't you?" She had read Mr. Hurd's will and knew that the estate would go to Dr. Hurd.

A letter to Dr. Hurd speaks of the stinginess and crankiness of his grandfather, of his meanness in getting a stick and beating her little grandson, of his smoking ways, and of his being too mean to be around children. This was dated April 22, 1908.

Her only explanation of these references to stinginess, crankiness, etc., was that Mr. Hurd requested her to so write in order to deter them from writing for money. Her representations, if untrue, are not excusable on this ground; much less does it furnish an excuse for representations of her friendliness to Dr. Hurd and her attempts to exercise an influence upon his father on his behalf. The evidence and circumstances shown thereby indicate, on the other hand, that she was really engaged in exciting his prejudices against them by suggestions that all they cared for was to get his money.

We are satisfied from the evidence that instead of his gifts being voluntary acts of an old man in grateful appreciation of daughterly affection, kindness, and care, or the acts of a lover desiring to provide for the future of a woman whom he was prevented from marrying solely by fear of his son, they were the result of fraud and undue influence practised and obtained through letters and recommendations purporting to come from his deceased wife. Without those he would not have parted with his money in the large amounts shown by the bank books and drafts.

The plaintiff, as executor, is entitled to a decree canceling the said gifts and transfers of money, and impressing a trust upon the securities into which said moneys have been converted. As

the defendant has failed to discover the said securities, and the Washington Loan & Trust Company has but one in its possession, and that subject to a charge, the plaintiff is entitled to have such incidental auxiliary process as may be necessary to procure the possession of all such securities and the proceeds thereof.

The decree is reversed, with costs, and the cause remanded with direction to make such orders and to issue such process as may be necessary to the complete relief of the plaintiff, and thereafter to enter a final decree in conformity with this opinion.                                          *Reversed.*

A motion by the appellee for rehearing was denied May 13, 1913. A motion by the appellee for the allowance of an appeal to the Supreme Court of the United States was denied May 13, 1913. The mandate was issued June 2, 1913. A motion by the appellee for leave to file a bill of review was filed June 23, 1913, and was denied October 8, 1913.