Homer H. CLARK, Jr., Executor, Estate
of Helen A. Clark, Deceased,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 7184.

United States District Court
D. Colorado.

Oct. 18, 1962.

Gorsuch, Kirgis, Campbell, Walker & Grover, James H. Turner, Denver, Colo., for plaintiff.

Lawrence M. Henry, U. S. Atty. for District of Colorado, Denver, Colo., Burton A. Schwalb, Washington, D. C., for defendant.

DOYLE, District Judge.

The above-entitled action arises under the Internal Revenue Laws of the United States, and specifically Title 28 U.S.C. § 1346(a) (1). It seeks a refund of federal estate taxes together with interest upon the allegation that these taxes were illegally assessed and collected from the plaintiff by the District Director of Internal Revenue for the District of Colorado.

The plaintiff, as executor of the Estate of Helen A. Clark, having been appointed by the County Court of Boulder, Colorado, on November 24, 1958, prepared and filed with the District Director of Internal Revenue for the District of Colorado an estate tax return showing liability of $245.93 based upon a taxable estate of $6,370.44. The return did not include property which Mrs. Clark had transferred to her husband just prior to his death and hers. However, the District Director increased the taxable estate to $70,288.13, adding $63,917.69 to the gross estate. This represented the value of property which the decedent had transferred to her husband, Homer H. Clark, deceased, on or about August 29, 1958. Additional taxes were assessed and these amounted to $11,892.44, together with interest in the amount of $552.75. This latter assessment was

paid and thereafter, on December 19, 1960, the plaintiff filed a timely claim for refund, which claim was disallowed on May 31, 1961. The present action was instituted on June 28, 1961, and it seeks to recover $11,892.44, the additional estate tax paid, together with interest in the amount of $552.75.

Most of the facts herein are undisputed. The transfer in question occurred on August 29, 1958, while the decedent was residing in Clearwater, Florida. It consisted of a transfer to her husband, Homer H. Clark, of 200 shares of American Telephone and Telegraph Company common stock, 111 shares of Eastman Kodak Company common stock and 155 shares of Standard Oil of New Jersey common stock.

On September 4, 1958, Homer H. Clark, Sr. and Helen A. Clark executed wills. Three days later, on September 7, 1958, Homer H. Clark, Sr. died. A United States estate tax return was filed for this estate and this included the securities which his wife had a few days before transferred to him. Mrs. Clark passed away on November 10, 1958.

The estate tax return filed in the Homer Clark estate reflected a gross estate of $138,738.54. A marital deduction in the amount of $61,729.25 was taken and the result was a taxable estate of $17,009.29. The estate tax on Homer Clark's taxable estate was $1,271.02 and this was paid by the executors.

The circumstances surrounding the disputed transfer were presented fully at the trial and may be summarized as follows: Homer H. Clark, Sr. and Mrs. Clark had resided at Greenwich, Connecticut, prior to his retirement. He had been Vice President of Acme Steel Company. In the year 1958, the Clarks moved to Clearwater, Florida. At this time they were both of the age of sixty-eight. This move was brought about by the retirement of Homer Clark by the fact that Clearwater, Florida had a better climate and was a less expensive place to live. Mr. Clark had suffered a heart attack in 1949. In the summer of 1958, the Clarks visited Homer Clark,

Jr., a Professor of Law at the University of Colorado College of Law, at Boulder. During this visit Mr. Clark had an illness requiring brief hospitalization. This was not a heart attack but was something similar to it—heart fibrillation. At this time Mrs. Clark was also experiencing some problems. It was noticed for the first time that she was having difficulty remembering things. Prior to that time her household duties involved shopping, drawing checks to pay bills, and driving an automobile. However, due to her memory lapses, it was no longer possible for her to maintain a check balance, nor was it possible for her while in Boulder to drive a car since she would lose her geographical orientation. At this time certain moneys had been held in joint checking accounts, and in addition she held securities having a value of approximately $77,000.00. These had been purchased from the earnings of Homer Clark, Sr. and had been placed in her name.

When Mr. and Mrs. Clark returned to Clearwater in August, 1958, the plaintiff, Homer Clark, Jr., returned to Florida with them. While there he consulted a local lawyer and arranged for the preparation of wills for both of his parents. Also, the attorney advised that the mother's health suggested these securities should be transferred from her to Homer Clark, Sr. Thereafter, a conversation was had between the Clarks and their son at which it was tactfully pointed out that she was experiencing difficulty and that an attorney had advised that the shares be transferred to her husband. She was very much aware of her condition and readily consented to the transfer, endorsing the securities in the presence of her husband and son. They were then taken to a transfer agency and the transaction was completed some weeks later.

Helen Clark's will (which was signed September 4, 1958), gave all of her estate to her husband, Homer H. Clark, and provided that if he should predecease her all of her estate should go to her two sons. The will of Homer H. Clark (the one dated September 4, 1958), created a trust for the benefit of Mrs. Clark and provided that if she should predecease him, then all of his estate was to go to their two sons. It further provided that the trust was terminated upon the death of his wife and that the assets would then be paid to his two sons.

To show motivation for the transfer to Mr. Clark other than contemplation of Mrs. Clark's death, medical testimony from doctors who examined both of them in the summer of 1958 was offered. An internist, Dr. Avery, testified that Mr. Clark's attack was not severe; that it was an interruption of rhythm of his heart. However, Mrs. Clark had organic brain damage, probably caused from a cessation of blood to the brain. Dr. Avery said that his examination revealed that she had an enlarged heart and hardening of the arteries, and deterioration. He referred her to Dr. Plazek, a psychiatrist and neurologist. He performed a complete mental and physical examination and found that Mrs. Clark was very depressed, was having difficulty orienting herself, and showed rumination symptoms. She was very much aware of her condition and was inclined to try to suppress her awareness of it. This, in turn, would cause depression. This physician testified that his prognosis was that she would live a long life since institutions are filled with older persons who have her symptoms.

The plaintiff testified that neither he nor his father nor his mother were thinking of avoiding taxes when the transfer was made; that their sole concern was that she would likely survive the father and it was, therefore, necessary to remove the property in question from her control—that their sole concern was to make an arrangement whereby Mrs. Clark would be protected in the event of plaintiff's father's death prior to her death. The entire thrust of his testimony was that the transfer was not in contemplation of her death, but rather in contemplation of her survival.

No positive testimony was offered by the Government. Its factual case was

limited to cross-examination of the plaintiff's witnesses and the deductions favorable to the Government to be applied to that evidence.

From a consideration of all of the testimony in the case it must be concluded that the motivation of the transfer in question was not the saving of estate taxes but rather was induced by a deep concern for Mrs. Clark and a desire to protect her interests in the event that Homer Clark, Sr., predeceased her.

The issues to be determined are as follows:

## I.

Did Helen A. Clark (considering her possible lack of capacity) make an effective transfer or gift of securities to her husband, Homer H. Clark, Sr., on or about August 29, 1958.

## II.

If the transfer was sufficient in law, are the values of the securities which were transferred nevertheless properly includable in the gross estate of Helen Clark for federal estate tax purposes on any one of the following grounds:

A. Were these gifts or transfers in contemplation of death within the meaning of Section 2035 of the Internal Revenue Code of 1954; or

B. Were these gifts or transfers made under such circumstances that they were to take effect upon death under Section 2037 of the Internal Revenue Code of 1954; or

C. Were these gifts or transfers which were revocable under Section 2038 of the Internal Revenue Code of 1954; or

D. Were the gifts or transfers made with a retained life estate within the terms of Section 2036 of the Internal Revenue Code of 1954.

## I.

### CAPACITY OF THE DONOR

The threshold question is whether Mrs. Clark had the capacity to make an effective transfer or gift of the securities in question to her husband on August 29, 1958.

The sole point raised by the Government in this connection revolves around whether Mrs. Clark could have the requisite intent to make the transfer in the light of the evidence showing that she was then suffering from organic brain damage and was then manifesting various symptoms. Edson v. Lucas, 8 Cir., 40 F.2d 398, 404, sets forth the requisites of a valid gift as follows:

" * * * There must be a donor competent to make the gift, a clear and unmistakable intention on his part to make it, a donee capable of taking the gift, a conveyance, assignment, or transfer sufficient to vest the legal title in the donee, without power of revocation at the will of the donor, and a relinquishment of dominion and control of the subject matter of the gift by delivery to the donee."

We are here concerned with the two related elements of competency from the standpoint of awareness and capacity to form an intent to make a gift. The test of mental capacity is the ability of the donor to understand the nature and effect of the transaction.[1]

It has also been held that manifestations of mental defect do not of themselves establish incapacity,[2] and that neither age nor physical weakness and debility, nor disease of the body will affect the capacity of a person to make a valid conveyance if such person possesses sufficient intelligence to understand the nature and effect of the conveyance.[3]

Bearing in mind that the present inquiry, or consideration, is somewhat collateral and incidental inasmuch as the main problem here is tax liability and not validity of the gift, and assuming that the Government can properly raise

1. 24 Am.Jur. 737, § 16, Gifts; Conners v. Murphy, 100 N.J.Eq. 280, 134 A. 681, 53 A.L.R. 1115.

2. Hurd v. Cramer, 40 App.D.C. 349, cert. denied 229 U.S. 623, 33 S.Ct. 1051, 57 L.Ed. 1356.

3. Meyer v. Jacobs, 9 Cir., 123 F. 900.

the matter, the question reduces itself to whether organic brain damage together with the manifestations described in the evidence are sufficient to justify avoidance of the transfer.

The evidence, considered in its best light from the standpoint of the Government, provides no more than a basis or foundation for a more specific showing that on the occasion of the transfer Mrs. Clark was incapable of understanding the nature of the transaction and was incapable of intending to make the transfer.

 There is a lack of necessary, specific evidence showing or tending to show that she was on the particular occasion of the transfer unaware of the nature and effect of the gift. Indeed, the Government has not offered any evidence on this point and the undisputed testimony of the plaintiff is that a full explanation was given to Mrs. Clark and the transaction was understood by her. If the testimony bearing on Mrs. Clark's general condition had established her complete lack of mental ability, the result would now be different. But it does not go that far; it merely shows loss of memory, lack of orientation, and great concern on her part about her condition. Therefore, accepting the Government's premise that the burden of proof is on the plaintiff to establish capacity, it must be concluded nevertheless that this burden was here satisfied and that the decedent had the requisite capacity to make the gift and, secondly, that she intended to transfer the property on August 29, 1958.

## II.

Having concluded that the donor had requisite capacity and intent, the next inquiry is whether the value of the transferred securities were properly included by the Director in her gross estate for federal estate tax purposes for the various reasons assigned by the Government.

## A. WAS THE TRANSFER MADE IN CONTEMPLATION OF DEATH

The applicable statute [4] provides for inclusion in the gross estate of the decedent all property transferred by him in contemplation of his death. It further provides that if the decedent within a period of three years, ending with the date of his death, transferred property, it shall be, unless shown to the contrary, deemed to have been made in contemplation of death.

The applicable regulation [5] fully defines the phrase "in contemplation of death." It declares that it does not have reference to the general expectation of death which all persons entertain, and further that it is not restricted to an apprehension that death is imminent or near. It then goes on to provide:

> "* * * A transfer 'in contemplation of death' is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition."

The present facts must be weighed in the light of the above definitions. So, the inquiry is, whether the transfer in question was made for the purpose of avoiding death taxes, was made as a substitute for testamentary disposition of property, or was made for any other motive associated with death. Generally speaking, these are the same tests which were earlier set forth by the Supreme Court in the definitive case of United

---

4. Section 2035 of the Internal Revenue Code of 1954, 26 U.S.C. § 2035.

5. Section 20.2035–1(c), Federal Tax Regulations.

States v. Wells.[6] The opinion of Mr. Chief Justice Hughes in that case stated that the controlling test is motive of the decedent and the inquiry is whether the decedent's object was to substitute the transfer for a testamentary disposition and the motive of the decedent which induced the transfer must be of the sort which leads to testamentary disposition. The Court went on to point out that the presumption arising from gifts within the three-year period (then two years) is a rebuttable presumption and further the fact that death ensues even shortly after the gift, does not determine absolutely that it was in contemplation of death.

In Wells, the Court of Claims had found that the transfers there under consideration were a part of a long-term plan of the decedent to distribute his property among his children on an equal basis during his lifetime. The Court of Claims had also laid down a requirement that there be a fear that death is near at hand, and although Chief Justice Hughes disproved this test, the judgment of the Court of Claims was nevertheless affirmed on the basis of the findings of fact and conclusion that the dominant motive was systematic distribution during decedent's lifetime rather than testamentary disposition.

Different facts produced a conclusion that the transfer was in contemplation of death, in Sloan's Estate v. Commissioner of Internal Revenue,[7] wherein the decedent had transferred a number of insurance policies on his life to a corporate trustee to hold for the benefit of his two sons. The purpose of the transfer was to provide cash to the executors for redeeming real property from taxes and carrying charges and for paying estate taxes and expenses of administration, and also for the purpose of avoiding forced sales of securities. In this instance the motive was correctly held to be primarily testamentary in nature even though the decedent was not thinking about death in a specific way. Neverthe-less, the decedent was generally occupied with problems which would arise upon his death, and this was the controlling factor. In Wells, on the other hand, the primary motive was distribution during the lifetime of decedent.

Turning now to the facts of the present case, it appears that although Mrs. Clark was at the time of the transfer in ill health, it can not be said that either she, her husband, or her son, was concerned with testamentary disposition or avoidance of taxes. The undisputed evidence shows instead that the concern of all of the parties was that Mrs. Clark would survive her husband. The transfer was made not because of preoccupation with problems likely to arise in the event of her death, but rather was motivated by the probability that Homer Clark, Sr. would predecease her. This motive emerges not only from the testimony and the surrounding circumstances, but also from the form of the respective wills, that of Homer Clark, Sr. having provided a trust for the benefit of Mrs. Clark, whereas her will was a simple testamentary disposition of all her property to her husband. Thus, they were thinking about her inability as an invalid to manage the property and were providing for the sons' assuming the responsibility.

The evidence is not merely persuasive to this point—it has a convincing character. It is impossible to reconcile the circumstances with a motive of apprehension of death on her part. The motive on her part was, therefore, consideration of life rather than of death.

It is concluded that the purpose of the transfer was to make provision for Mrs. Clark in the event that she survived her husband. The purpose was not to avoid taxes or to affect a testamentary disposition. It follows that the evidence is amply sufficient to overcome the presumption created by Section 2035, supra, and that the transaction is not within the terms of this section.

6. 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867.

7. (2 Cir.) 168 F.2d 470. The facts of that case are in striking contrast to the facts of the case at bar.

## B. WERE THE TRANSFERS SUCH AS TO TAKE EFFECT UPON DEATH

█ The applicable statute [8] provides that the gross estate shall include property transferred under conditions whereby: 1) possession or enjoyment of the property can be obtained only if the donee survives the decedent; and 2) if the decedent has retained a reversionary interest in the property and the value of such interest immediately before the death of the decedent exceeds five per cent. of the value of such property.

The applicable regulation [9] makes it clear that the term "reversionary interest" does not include the possibility that the donor will receive back an interest in the transferred securities by inheritance, nor does it include the statutory right of a spouse to receive a portion of the estate of the other spouse. In order to come within the terms of this section the transfer must expressly, or by operation of law, reserve a reversionary interest in the donor. In the case at bar there was no instrument of transfer, and furthermore there was no oral agreement whereby Mrs. Clark retained any interest in the property. The most she could hope for was that she would succeed to the transferred interests if her husband predeceased her. The simultaneous wills suggest the possibility that they were executed upon a reciprocal basis; yet, there is no evidence to establish that this was the intent of the Clarks at the time. Consequently, it cannot be said that this factor operates in such a way as to create a reversionary interest within the meaning of Section 2037.

## C. WERE THE TRANSFERS REVOCABLE UNDER SECTION 2038 OF THE INTERNAL REVENUE CODE OF 1954

█ The statute here under consideration [10] contemplates the existence at the date of death of the decedent of a power which would have some effect on the enjoyment of the property previously transferred. From the evidence in the case it does not appear that there was retention of power to alter, amend, revoke or terminate. From all that appears, Mrs. Clark fully relinquished her authority over the securities in question and no remaining string was available to her prior to her death. The transfer vested ownership and unrestricted power over the property in her husband and upon his death the title and the power to deal with his securities passed to the trustees named in his will. Therefore, even if Mrs. Clark had wished to bring about some modification during her lifetime it would have been necessary for her to obtain the consent of the trustees, her two sons. Under the express terms of the regulations,[11] it is clear that where such consent is necessary a power such as is contemplated by the section does not exist.

## D. THE QUESTION WHETHER THERE WAS A RETAINED LIFE ESTATE

█ In order for the statutory provision which is here relied upon [12] to apply, there must be a retention by trust, or otherwise, for the period of the donor's life, of possession or enjoyment of, or a right to the income from the property; or 2) the right to designate the persons who shall possess or enjoy the income therefrom.

Clearly, there was no express agreement in the present case whereby Mrs. Clark retained a life interest. The most that can be said in favor of the Government's position is that there was a relationship of absolute trust and confidence between Mrs. Clark on the one hand, and her husband and son on the other, whereby she unhesitatingly made this transfer at their suggestion. However, viewing the evidence in the light most favorable

---

8. 26 U.S.C., § 2037.

9. 20.2036–1(c) (2).

10. Title 26 U.S.C., § 2038.

11. Regs. 20.2038–1(a) (2).

12. Title 26 U.S.C. § 2036.

to the Government, it does not follow that there was any agreement, either express or implied, whereby the income from the transferred securities would be devoted to Mrs. Clark during her lifetime. There was, of course, a belief by her that her interests would be protected, but it is not possible to read a retained life estate into this kind of arrangement. If it could be said that Mrs. Clark had an enforceable right to the income it would follow that she had retained a life estate therein even without an instrument expressly creating such an interest.[13] If there had been a payment of income for the life of the decedent such as was present in McNichol, supra, it is possible that an agreement to this effect could be inferred from the transaction. However, in the case at bar the evidence does not disclose that this particular income was devoted to her.

Undoubtedly, Mrs. Clark had an equity in the transferred property which would have, under certain conditions, received court protection. If, for example, Mr. Clark had exercised unrestrained dominion over the property and had wasted it, it is possible that a court of equity would have discovered a remedy for her. This, however, does not prove that there was a retained life estate within the contemplation of Section 2036, the express terms of which require possession or enjoyment of, or the right to the income from the property, or the right to designate possession and enjoyment.

In the final analysis, the interest, if any, of Mrs. Clark, does not satisfy any of the provisions of Section 2036 and, therefore, it cannot be concluded that it is subject to an estate tax upon this ground.

It follows from the above findings and conclusions that plaintiff is entitled to the relief prayed for. It is, therefore,

DIRECTED that judgment be entered in favor of the plaintiff and against the defendant, in the amount of $11,892.44 plus $552.75 interest, together with interest to the extent authorized by statute.

13. McNichol v. Commissioner, 265 F.2d 667.